Case number 23-5310, Battle Creek Health System et al. versus Xavier Becerra, Secretary of the United States Department of Health and Human Services, appellants. Mr. Kennedy for the appellants, Mr. Houck for the appellees. Good morning, Council. Mr. Kennedy, please proceed when you're ready. Kevin Kennedy for the government. The Provider Reimbursement Review Board has jurisdiction over challenges to determinations of the amount of the payment that hospitals will receive under Medicare. Under the Medicare Act and its implementing regulations, CMS makes such challengeable payment determinations at two points. First, where payment amounts can be determined prospectively, it does so in its annual rulemaking. Second, where payment amounts can only be determined retrospectively because they involve costier data, it does so in notices of program reimbursement. That scheme makes sense. It consolidates review so that once hospitals know precisely how much they'll be paid, they have one opportunity to challenge any feature of their prospectively set payment amounts and one opportunity to challenge any feature of their retroactively determined payment amounts. Plaintiffs' desired approach in which they could challenge one component of a payment amount and the district court's holding below would upend that scheme. It would create uncertainty over which determinations sufficiently relate to warrant review and bog down the PRRB in piecemeal litigation over interim determinations that may or may not bear on the ultimate payment amount. This court should reverse the decision below. I welcome the court's questions. Well, I have a question that's, um, wasn't really brief, but it's kind of, it's about redressability in these circumstances. So is it, what would happen if we ruled in favor of the challengers, given that, as I understand it, the payments for that year have already been made based on whatever ratio ultimately was deemed to be the appropriate one for FY 2007? And so what, what, what is the, what's at stake here in concrete terms with respect to that year? And it could be done with respect to that. So if the PRRB had jurisdiction over the challenge, uh, then I believe they could obtain a recalculation of the amounts and their notices of program reimbursement. Um, uh, according to, you know, if in fact the, the Part C days, so the idea would be, it was wrong to include the Part C days issue in the Medicare fraction. Um, and there would be some question about how then the amounts of the district payment should be calculated if that was incorrect. Uh, but they might obtain a different payment amount if it, if so. Okay. So the government doesn't have any issue with the fact that if, I know you have a lot of issues with whether the PRRB had jurisdiction, but if the PRRB did have jurisdiction, then the government has no problem with, uh, we go forward. We haven't, we haven't raised a standing argument here, your honor. Um, and I think, you know, we think that the PRRB dismissal, I guess it would be, or a mootness argument. I do think it's, you know, it is odd that they have challenged fractions that were not ultimately used to, uh, make their, uh, determination as the amount of payment, which we raised in our finality argument, but we haven't, we haven't raised a standing or mootness argument here, your honor. The CMS never reconsidered or revised its choice to count Part C patients toward the Part A populations. Is that correct? Um, between the time that these fractions came out, uh, I think, I think that's right after the fractions came out and between the time that notice of program reimbursement was ultimately, uh, issued. Uh, but again, the, the issue of the Part C days itself does not determine an amount of the payment. Yes. And then, but one of the reasons that you say it's not final, the statute requires a final determination, secretaries, the amount of payment under, but you say, well, it's not final because it could have been revised. And of course, some of, some of there were parts, there were things that were revised after 2009, of course, but as you just said, the decision to count Part C patients toward the Part A population, that was not revised. So under your theory that it's not final, if it merely could have been revised, does that mean that no publication of Medicare fractions could ever be final? No, your honor. Um, I, our argument on finality is that, uh, the disproportionate share adjustment, you look to whether it represents the culmination of the agency's process on, on something. And the culmination, according to the regulations, occurs at the final determination of payment, which is in the notice. But even that could be revised, right? It, it could have been revised. So it can't be the case that the test is it's only final if it cannot be revised. I agree with that, your honor. And I, I think, um, that's, that's black letter law. The question is not whether some final action could have been revised, but whether the action in question was final. And that action in question did reduce hospitals' dish payments, correct? No, your honor. Um, the, the Part C days, I mean, so for the hospitals here, they don't know at the time that they received their Medicare fractions, whether they will or will not receive a disproportionate share adjustment. The CMS issues Medicare fractions for every hospital, but it doesn't go on to issue dish payments for every hospital because only those hospitals that, based on the later computations that the secretary still needed to compute, qualify. Did it either reduce, it seems like it had to either reduce the dish payments or for some hospitals completely eliminated the dish payments, right? I think there are some hospitals who might have felt fallen below the line no matter what. Um, so it's, there's no direct link. Um, but again, that, that, that's not the question under the statute. There's no, there's no hospital, well, A, there's no hospital that got an increase in dish payments as a result of the choice to include the Part Cs in the Part A population, correct? I think it's conceivable, uh, but I, I'm not sure, your honor. Um, but I, again, I think that, again, the statutory question is whether the challenged determination settled the amount payment, meaning in this court's terms, the per patient amount. And the Part C days, the resolution of the Part C days issue certainly did not. And were there any remaining variables for the government to, you know, in its expertise and discretion, make a decision about? Absolutely. Um, so in addition to the Medicare fraction there, the disproportionate share adjustment requires the agency to compute the Medicaid fraction. Right. But I thought all the numbers that go into the Medicaid fraction, the hospitals already have. So they have the cost report data. Uh, but there, it's not just math that goes between cost report data and the ultimate Medicaid fraction. There are interpretive choices that the agency needs to make. They need to decide, for example, how to determine who is eligible under a Medicaid plan and how to count, uh, patients participating in demonstration projects. So both of those interpretive choices are sort of a major variable between the cost report data and the ultimate, ultimate disproportionate, uh, share adjustment that is the per patient amount that they can was that not the case in Washington Hospital? So no, you're on there as this court recognized. Um, the secretary had secretary had acted in a final manner as to both of both. There were only two variables, and it acted in a final manner as to both of them. So they knew precisely how much they were in hospital in Washington Hospital Hospital said there were things that could be very later. This was just an aspect of the final payment. That's why I don't understand how this case is not controlled by why I'm just reading it right now. They were very clear that this was just an aspect of and I don't see how you're conflating a little lie and a double little lot. So a double is not the same language as a single lot, and you just jumped right over, and I was stunned by your opening. We have precedent. At least this judge appears to be directly on point, and Judge Wall addressed all of your points. And the fact that it is merely an aspect of the final payment does not mean that it's not a final determination, she said, and that's exactly one on here. And she acknowledged that it could change later that the final determination could change later, even though this aspect could be challenged now, and you're just ignoring all that respectfully, Your Honor. I disagree. If I can address Washington Hospital first. No, no, you can't disagree because your opening was one minute, and you never mentioned Washington Hospital. You never attempted to deal with the precedent in the circuit. It's directly on point. Well, if you'd allow me, I'd like to address it now. I would like for you to. Okay. So in Washington Hospital, that language, some aspect of the payment calculation, is describing the challenges that the providers there brought, not the determination that triggered the jurisdiction in that case. And if you look at the determination that triggered the jurisdiction in that case, the court is very clear that it settled the final variable factor and thus produced a per patient amount. And it was the availability of that precise per patient amount that hospitals could challenge under Romanet 2. Now, I agree that Romanet 2 and Romanet 1 are different provisions that have different scope. And where, for example, in the federal base rates of payment through its annual rulemaking, the agency determines prospectively the amount that hospitals will be paid under their base rate. It settles all the variable factors in that calculation. Providers can and do challenge under Romanet 2. It's simply the case where it hasn't reached a determination as to all of those variable factors that they cannot. This one's retrospective. This one is retrospective. So you don't know until later. That is right. You don't know until later. And just taking a step back, hospitals regularly challenge their disproportionate share adjustments through their notices of program reimbursement or where there's an untimely reimbursement. This court has heard cases about disproportionate share adjustment, the agency's position on Part C days, because hospitals regularly raise those challenges against the notice of program reimbursement or in the case of an untimely reimbursement. I guess the question is, do they have to? They might well do that regularly. And the question is, do they have to wait until then? And on that, can I just ask you, just as a practical matter in the way the world really works, you get the Medicare fraction. And then it's true that you don't know to a moral certainty what the final amount is necessarily because there's also other inputs. There's the Medicaid fraction, but there's also a bunch of information that the hospital actually has. And so I assume that what's happening when the hospital gets the that was gotten here before the claim was filed was that they've been projecting what their dish payment is going to be. And because they have a lot of information that would give them that. And I guess my practical question is, is it true that there are instances and a fair number of instances or at least a non-trivial number of instances in which what a hospital would forecast at that time actually turns out not to be the amount that they get? Absolutely. I think projection is the key word here. I mean, in addition to, and I will address your honor's question there, it's not only sort of the delta between the amount in practice. It's also the fact that the statute describes the component calculations and assigns those to the secretary. So I think it's very odd that providers could get ahead of the secretary under the language of the statute. But addressing the amount... Before you go on, because I want you to bracket about the amounts too, but was that different in Washington, in Washington hospital? That was different. If you read this court's decision, it says the determination as the per patient amount had two component variables. And it looked to see whether the agency had acted in a final manner with respect to both component variables. And so there, once the agency acted with respect to the second variable, it triggered the jurisdiction to review. So the agency had, by its own regulations, acted in a final manner on both of the things that mattered. Here, there are at least, I mean, there are multiple variables, but at least the Medicare and the Medicaid fraction. And if you look at the statutory language, it says an additional payment amount for the disproportionate share adjustment. I'm paraphrasing there. But then it says, you need to calculate at least the Medicare fraction, or you need to calculate the Medicare fraction and the Medicaid fraction. So just according to the statute, there hasn't been a final action on the second component. And I think that that is, it's not only a statutory point, it is also a point about, in practice, how different the hospital's estimation is going to be from the actual numbers that come out in the disproportionate share adjustment. So on that point, there, you know, you can imagine a situation where the agency's position on how to treat patients eligible for Medicaid or patients under a demonstration project, I believe Your Honor had a case about this recently, they didn't have a position on the books at the time the And so they need to put, they have rulemaking and they determine their position on how to do those things in between when the Medicare fraction comes out and when the Medicaid fraction comes out. So that's going to put a huge wedge between, you know, a provider can't know exactly how those rules are going to come out. So there's a big interpretive question that could come between when the providers think they can know how much they're going to get and when they actually know how much they're going to get. And then in every case, in addition to that sort of interpretive question, in every case, the Medicare contractors audit the numbers that the cost of the cost reports that the hospital submit. So if you look at the cost report is what they used to estimate their dish payments and that, but the Medicare contractors audit them and they often remove Medicaid days from the count. And so we point to a couple places in the administrative record, I believe at 109 and 110 of the administrative record, where in this case, as to some of the contractors remove days so that that's putting another wedge between the amount that they're estimating and the actual amount. So in terms of those two examples of wedges, what happens if that kind of wedge situation arises after what you even concede would be final, where, where the, is it the NPM? I'm forgetting the acronym. Notice of Program Reimbursement. Yeah. NPR. So at that point, it's become final under your estimation too. I mean, you could still have a scenario in which could you still have an audit and something could get reconfigured or is it too late to do it that way? So there, I'm not sure of the total extent of whether there could be an audit, but I think in that case you would absolutely have at the NPR definitely triggers jurisdiction to challenge before the PRRB. So whether or not there might be a reopening or some other audit there, whether or not there could be some other change that happens to the disproportionate share adjustment, you absolutely can bring your challenge before the PRRB once you have a Notice of Program Reimbursement. I should also say that sometimes it takes a long time to issue these Notices of Program Reimbursement and my friends on the other side are very concerned about the delay, but there's also a backstop. If the Notice of Program Reimbursement does not come, if you have submitted your cost report and 12 months elapsed, you can then bring a challenge before the PRRB. So I, I here are, are substantially overstated. Do you think that this, there's a difference in the meaning of, of the text in the statute and the text I'm about to contrast with that? So the statute says final determination of the Secretary as to the amount of the payment versus imagine said final determination of Secretary of the amount of the payment. Do you think that as to versus of should matter? I think both of those would require a determination that sets the actual amount of the payment. So I get why that would be the case for of, but you know, something as to sounds like kind of related to or about, and, and, you know, hypothetical off the top of my head, but, you know, you know, a missed free throw can, you know, relate to the final score of the game, but it's not the final score of the game. So I think if the statute said related to the amount of the payment, that would be a very different case. And that's sort of the interpretation that the other side is positing. But I do think as to is draws quite a clear connection between the determination and the amount of the payment. But even if your honor disagrees about as to, which I think is sort of necessary, you have to interpret it in context because it's, it's this sort of connector word. If you look elsewhere, just at the language immediately preceding this in A, it says for those hospitals receive payments in the amount calculated under sections B and D, and then it refers to such payments, they can challenge such payments. And so I take it to be the whole scheme is referring to the actual determination of payment, an amount of payment. And just to make a sort of a more policy oriented point here, if my friends on the other side were right, that it meant something like related to, then they could challenge their Medicare fractions. They could separately challenge how the, a rule about how the agency was going to consider eligible days under Medicaid. It could separately challenge a rule about demonstration projects, all before they have received any, any of those had gone into an actual payment amount. So I, it's hard for me to see how that would actually expedite review and ultimate determination of the payment amounts. Well, that's helpful. Even that helpful. I did, I did think of a better hypothetical, though. I think it's at me. All right. So imagine it's the first half of a basketball game and the referee makes a final determination about a foul and that foul leads to two free throws that are made. It seems like it'll be a final determination as to, you know, what became the final score, but it's not the final score. And it seems like, it seems like that's sort of what's going on here, that the secretary has made a determination as to the amount of the payment, because the secretary has made a final determination that is going to reduce at least some hospitals dish payments, even though it's not an actual final payment. I don't know that I think in the hospital, in the basketball example, which I appreciate, there would be a, you would say that would be a determination as to the final score. I think it's a determination that affects the final score, but a determination as to the final score would be, you know, if they had to, you know, figure out if a shot went in at the buzzer and it did, they, you know, it did in fact go in and then they went to the score table and they said, okay, the final score is 103 to 100. That's the determination as to the final score. All the prior determinations I think might affect the final score, but they're not determinations as to the final score. To follow up my colleague's example, it's like instant replay. You're it may not affect the final score, but it has an impact on the entire process. And you say, no, that call was wrong. I want you to stop now. So we want a determination now as to what the correct call should be. As much as I enjoy the basketball analogy, I am going to steer us back to the, to the statutory text and say, you know, the question is whether it determined an amount of the payment and because it did not, because many of the hospitals that receive the Medicare fractions will never go on to receive disproportionate share adjustments. And none of them know precisely how much they would be paid. It doesn't satisfy the statute. What kinds of, if it really meant related to, and it was the outer perimeter related to as in bearing on as in could potentially affect how many claims would the PRRB then get from hospitals? Because how many, I mean, you know, this team better than I do. How many determinations are there that could affect the final payment amount? I mean, I think there are myriad, I can't put a number on it, but I agree from that with your honor's point that this would bog down the PRRB and many, many determinations that, you know, only might bear on determination. And I'd point the court to this court's decision in Monmouth, where it said, you know, some procedural decision that might bear on the ultimate payment amount is not one that establishes or alters the actual payment. This seems more like a substantive decision than a procedural decision, a substantive rule versus a procedural. I agree, but I think it's just as far away from, it bears just as indirect a connection to the actual amount of payment in that it does not set an amount of payment and it doesn't sort of in every case affect the amount of payment. But again, to Judge Trinivasan's point, the scheme that plaintiffs propose in the district court's decision with countenance is one that would really bog down the PRRB in many determinations that simply, it makes sense to consolidate review at one point. You know, that's a familiar scheme from the law. I think you have one point to challenge the rates that the agency sets prospectively after the IPPS rule, and this court sees many of those cases, and you have one chance challenge after the notice of program reimbursement, and this court sees many of those cases as well. And that scheme works and it allows plaintiff hospitals to challenge all of the methodological choices that went into their payment amount determinations. I'm not going to ask hypothetical. One of the amicus briefs has some dictionary definitions of as to, and those definitions include with respect to and concerning. Now, I think what you'll probably say is, you know, context matters. Context always matters. And I agree. I thought one of the takeaways from Washington Hospital is that the context here is that Congress made a choice that things like this would get decided earlier rather than later. Once Congress shifted from the kind of retrospective regime to a more prospective regime. So, I agree context matters, and that is my broad point. I think the context of this payment is that it is retroactive. You necessarily need the cost of your data to figure out the per patient amount. And so, in that context, it makes good sense that you would challenge it at the end of the cost year when the total per patient amount has been determined. So, Washington Hospital concerned a prospective payment, which is different than... A prospective payment. A prospective payment. Yeah, sorry. Are there ever any times when a determination does not resolve every remaining variable that would affect the payment, and yet the determination can be challenged under A1, A2? So, I don't think so, Your Honor. That's our test, that they have to... that those determinations that trigger the PRRB's jurisdiction under Romanet 2 are those that resolve the last remaining variable, such that all of them have been resolved, and you know precisely the per patient amount. What about, and I don't recall the details of Shands-Jacksonville off the top of my head, but would Shands-Jacksonville pass that test? So, I believe that's a challenge to the annual rulemaking, and in that case, the federal base rates, there has been a determination as the amount of the payment with respect to the federal base rates, which are, you know, they include the wage index, they include the standardized amount, they include labor-related share, but the annual rulemaking determines all of those variables. And so, once the annual rulemaking comes out, there's been a final determination as the amount of payment because it determined all the variables in the formula, and hospitals know precisely how much they'd be paid per patient for any hypothetical patient. One of the briefs says, Shands-Jacksonville presupposed that A1, A2 authorizes review of the individual components of the base per patient calculation, and that base calculation consists of at least five components. Do you agree with that description of Shands-Jacksonville? Yes. So, that, though, I think that description sort of conflates the determination that triggers PRRB review with the methodological choices that the provider can get review of upon, you know, challenging such a determination. So, there, there was a final determination as the amount of payment, the IPPS rule, for the reasons that I've explained, it settled all of those five variables. And then, once you have a final determination as the amount of payment, you can get review of the agency's choice of how to resolve any of those variables. But your point is that you can only get that after all of the components have been decided. That's precisely right, yeah. Thank you, Janusz. Thank you, counsel. I'll give you a little bit of time for rebuttal. Mr. Houck? Good morning, your honors. Drew Houck for the Appley Hospitals. May it please the court. This case does not require this court to break new ground. Rather, the hospitals ask it to affirm nearly 40 years of settled law regarding the plain language of Subsection A, Romanet 2. At stake is judicial review of agency actions that directly affect the rights of hospitals to review of fair payment for treating vulnerable patients. You should affirm for three reasons. First, the Secretary's publication of the Medicare fraction meets every test for finality. It marked the end of the agency's decision-making process and imposed direct consequences on the providers. Second, the text of A, Romanet 2 plainly permits this kind of pre-NPR appeal. It lets hospitals challenge determinations affecting dish payments or rates without waiting for an NPR. Requiring otherwise simply collapses A, Romanet 2 into the preceding section, erasing Congress's protections for providers. Such a reading undermines these safeguards and worsens the harms Congress sought to prevent. Finally, delaying review when the outcome is a fait accompli allows errors in payments to persist, compounding financial harm to hospitals, potentially for years, and jeopardizing access to essential programs. Nothing could be further from what Congress intended with the faster, predictable process that was baked into A, Romanet 2. Therefore, the hospitals ask this court to affirm the district court's decision, finding that the board has jurisdiction to hear this appeal. With that, I welcome the court's questions. But why isn't a lot of what you say countered by the fact that this particular payment differs from a lot that otherwise occurs under the statute? Because this particular one is retrospective. And so with respect to this particular one, you need more information before you actually know the amount. Well, Your Honor, for two reasons, Your Honor. First, the idea that it's solely retrospective is factually inaccurate about how dish payments work. It is adjusted retrospectively. That is accurate. When the NPR is received by the hospital, there is an adjustment to the payments that have already been made. But it does, the dish adjustment sets a rate that is prospective. What do you mean when you say the payments have already been made? There are interim payments that are made. So hospitals receive over the course of a year prepayments on an estimate of what their dish by the agency of their former cost reports of previous years. So, for example, that's exactly why the June 2009 decision is so important. You'll see in the record, there was a transmittal issued in 2010. The agency noted that the June 2009 data was going to be used by the agency to make payments to the hospitals prospectively. They were going to get these dish adjustments prospectively. Those will be true to up at the end of the cost year. So it is true that there's a retrospective adjustment, but that's to make accurate the payments that had been made in real time over the course of a year, Your Honor. So it is both prospective and retrospective. The second reason, and you'll find this rationale in noted in Washington Hospital when this court was first addressing how do we understand prospective payments? They're not necessarily just prospectively paid. They're prospectively set. It's not accurate to think of them as prepayments entirely, and that's exactly how the dish statute or how the DPP, the disproportionate patient percentage here works. It sets a percentage ahead of time, and the hospitals get advanced knowledge of what that percentage is going to be and how it's going to impact them. It impacts them, as the Supreme Court said, by putting the Medicare Part C days here in the denominator of the Medicare fraction makes the fraction smaller and quote reduces hospitals payments considerably. That's not really rejected by the government. That's the known outcome of putting the Medicare Part C days in the fraction. By doing so, it certainly has a negative impact on the hospitals, and that's all the statute requires. It requires dissatisfaction by the providers by a determination made by the Medicare Act, and those certain sections include the dish section, and that's exactly where you'll find this calculation that's made by the secretary that includes these payments. So if the secretary, there's a similar thing that happens here, but in the very item that's at issue, that's under review, the secretary says, by the way, don't bank on this because we're still looking into this and you shouldn't take this as the definitive word because we're, you know, whatever they did the second time around with this payment, you think that that would still be final and it would give rise to the ability to go to the PRRB? Yes, Your Honor, and that's because if we take the facts here, we should measure finality at the moment that the secretary first publishes this data to the website. It was the final determination of the agency about where to put these Part C days, even when there was some indication given that they may not use this data to calculate reimbursements for these cost years in this sense retrospectively, that they wouldn't readjust the dish payments for 2007 and 2008 cost years. Subsequently, the agency said in 2010, actually, we will use that very data, that June 2009 data we will use to give your interim payments for 2010. It's not as though this was some temporary or proposed information they were going to use. It was the very data they did use. And it's still this agency's policy. The Part C days still remain in the denominator of the Medicare fraction. Nothing has changed. And just as importantly here, there was some discussion of alternative methods for how hospitals might otherwise be able to appeal. These hospitals during the course of their administrative appeal, they took what Congress gave them as the first chance. They had the first opportunity to appeal to quickly resolve this. And the agency during that course of that process, their intermediary indicated that there were no jurisdictional defects with the appeal. And when another determination came around that they could have appealed from, they did not appeal from it. That's true. But they didn't need to. They had no indication that what they had was a faulty appeal at all. And that door closed on them. And now they're left with this. The PRRB said it was not properly brought before the board, right? Seven years later, Your Honor. And there were no other alternative appeals for them to file at that point. I think it's also important. We've talked a little bit about hospitals that might receive NPRs that will have dish adjustments because they are actually receiving these payments. My friends on the other side noted one key factor of the dish structure here, the secretary's determination, it's also a threshold determination. Some hospitals won't receive a dish payment. They won't receive interim payments. They won't receive a dish payment on their NPR to be adjusted. That means they won't have anything to appeal via an NPR. They won't have an a Roman at one appeal. They won't have an appeal to be made for not having received an NPR that they could have appealed from for their dish adjustment. This is a prime avenue for them to appeal. So it's it's a very important method, which is exactly why Congress would have placed this part, this appeal in this part of the statute to make sure that these sorts of determinations which have an impact on thousands of hospitals could be handled quickly and efficiently. I feel like you've always let me go first today. I feel bad. Mr. Kennedy said he thought it might be conceivable at least that a dish payment could increase as a result of counting the Part C patients toward the Part A populations. Do you agree with that? Yes and no, your honor. No, I don't think it's conceivable that counting the Part C patients in the Medicare fraction can increase a dish payment. I understood something slightly different to have happened. I think adding the it's very technical, so I apologize. Adding the Part C days into the Medicare fraction is going to always lower the dish ratio or the SSI ratio, the Medicare side of that fraction, but it's only one half of the DPP, the larger Medicaid. Correct. The Medicare fraction, or the, I'm sorry, the Medicaid fraction could conceivably go off. There could be days that are added into that or patient days that are added into that and a provider could see that side of the fraction increase. And so in total, the payment that a provider could receive at the end of the day could be a larger payment. That's what I understood that discussion to mean. The provider's position though would still be that because the Medicare Part C days are included in the Medicare fraction, they would have always expected to still have been larger, that if you would have taken those Medicare Part C days out, it still would have been larger. So in layman's terms, if it were 10% plus 10% at the end of the day, so you had a 20% fraction, but if you took the Medicare Part C days out of the Medicare fraction, it would have been 11% plus 10%. You would have had a 20% DPP. That's the difference. The Delta would be the 1% difference that the hospitals would view as their damages in this case for including the Medicare Part C days in the denominator. Does that make sense? Maybe. I mean, I'm guessing that if at the end of the day, you ended up with more money, you would not be here standing on principle and saying, oh no, no, we deserve less money because the fraction should be higher and one fraction should be lower. Well, under that example, you'd end up with more money still if the Part C days were further out because both fractions would be going up, not one fraction going down and one fraction going up for the end ratio. So now I am a little confused. It sounds like now you're saying it will always be the case that under the government's decision that's being challenged here. Yes. It will never be the case that you get more money. It will always be the case under the challenge decision that the inclusion of the Medicare Part C days in the denominator of the Medicare fraction will deflate the Medicare fraction, which is one half of the larger ratio. But it could inflate the Medicaid fraction so much. No. I understood the discussion earlier that they were talking about an adjustment that could later happen with inputs into the Medicaid fraction, which is separate. That's not my question. Oh, I apologize. I misunderstood you. I'm sorry. Okay. And is it ever the case that because you have deflated the Medicare fraction, you are inflating the Medicaid fraction so much that you're going to get more money at the end of the day? If I haven't demonstrated, I'm bad at math already. But no, my answer to that is no, that should not be the case. No. Okay. One other piece that was pointed out there. I see I'm out of time. Your Honor, are there any other questions? I don't believe so. I'll ask one more. I asked Mr. Kennedy about whether the government would ever kind of flunk its own test. Its test being a pronouncement is not a determination as to the amount of the payment if it fails to resolve every remaining variable. And Mr. Kennedy said no, the government will never flunk that test. The government would never say something is reviewable unless it satisfies that that standard. Do you agree with Mr. Kennedy when he says the government would never flunk its own test? The test, there are no variables. No, I don't. I agree with the other cases that have been cited. What's an example of a time when the government allows an A1, A2 challenge, even though the CMS determination has not resolved every remaining variable? Where the government allows that? Yeah, where the government concedes that the challenge is right. Um, this court has found in these final rules, for example, I think you look to wage index cases, for example, or Cape Cod, where there was a rate setting challenge. I think those are prospectively setting, as the amici point out, for their prospectively setting rates and adjusting rates that will be paid. But there are other variables that are not yet set and what the final payment amount is going to be in an NPR. That final payment amount in an NPR is going to include many variables that are estimated rates. That includes dish, it includes outlier payments, it'll be at the end of the year, and those are estimates throughout the year. So I don't think that meets that same standard. I'd go to Cape Cod and find, is that a case you're talking about? Yeah, I'm sorry. I'd go to the Cape Cod case and I'd see, ah, well here the government is basically... I don't think the government says that. I think that's what Cape Cod is. It points to, it's an I don't think they stand for the principle that all variables have been set in advance and we know what the actual amount that a hospital is going to receive at the end of the year is, which is what I understand the government's position to be. It's a rule that's going to set rates. Thank you, your honors. Thank you, counsel. Mr. Kennedy, we'll give you two minutes for rebuttal. Great. I'd just like to address two things that my friend on the other side said. First, on that last point, with respect to the IPPS rule, when the IPPS rule comes out, hospitals know precisely the per patient amount that they're going to be paid. And that's why they can bring a challenge under Romanet 2, because there's been a final determination as the amount of the payment that they will be paid under the prospective payment system. They don't know the total reimbursement that they're going to receive, because that total reimbursement depends on cost year data. They couldn't bring a challenge under 1. That occurs only in the notice of program reimbursement. That's very different from the case here, where they don't know the per patient amount, because the very per patient amount is determined retroactively and determined based on cost year data. So in one case, the cost year data comes after the per patient amount in the federal base rates. In the other, the cost year data comes before the termination of the per patient amount, and that's what separates them. Second, the idea that interim payments somehow makes the disproportionate share adjustment perspective is wrong. The final payment determination, those are just placeholder payments that can be revised. Yeah, they're advances. The hospitals have no statutory right to them. They can be revised up or down. They're expressly non-final determinations as the amount of payment. They're just advances. So if the court has no further questions, I urge the court to reverse. Thank you, counsel. Thank you to both counsel. We'll take this case under submission.
judges: Srinivasan; Walker; Edwards